**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| LARRY HOLMES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case. No. 2:12-cv-2931-STA-tmp |
| v. | ) | |
| | ) | |
| DOUG COOK, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**ORDER DIRECTING CLERK TO MODIFY THE DOCKET,**
**ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2254,**
**DENYING CERTIFICATE OF APPEALABILITY,**
**CERTIFYING APPEAL WOULD NOT BE TAKEN IN GOOD FAITH,**
**AND**
**DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court is the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("§ 2254 Petition") filed by *pro se* Petitioner Larry Holmes, Tennessee Department of Correction number 93052, an inmate at the Bledsoe County Correctional Complex in Pikeville, Tennessee. (§ 2254 Pet., *Holmes v. Westbrooks*,[1] No. 2:12-cv-02931-STA-tmp (W.D. Tenn.), ECF No. 1.) For the reasons stated below, the Court DENIES the § 2254 Petition.

---

[1] The Clerk is directed to modify the docket to reflect Petitioner's current address at Bledsoe County Correctional Complex ("BCCX"), formerly known as the Southeastern Tennessee State Regional Correctional Facility. The Clerk is further directed to substitute current BCCX Warden Doug Cook for Bruce Westbrooks as respondent in this action and to terminate Bruce Westbrooks as a party to this suit.

1

## I.     BACKGROUND

### A.   State Court Procedural History

In April 2003, a grand jury in Shelby County, Tennessee, returned a ten-count indictment against Larry Holmes, Lacey Jones, and Bobby Harris.   (Indictment, *State v. Holmes*, No. 03-02148 (Shelby Cnty Crim. Ct.), Page ID 179, ECF No. 18-1.)   Counts 1-4 charged Holmes, Jones, and Harris with four counts of especially aggravated kidnapping, Count 5 charged the defendants with aggravated burglary, Counts 6-7 charged the defendants with aggravated robbery, Count 8 charged the defendants with aggravated rape, and Counts 9-10 charged the defendants with theft of property over $1,000.   The events at issue occurred between October 15, 2002 and October 16, 2002.

On April 7, 2003, Holmes pled not guilty to the charges in the Shelby County Criminal Court ("SCCC").   (Arraignment, *id.*, Page ID 180, ECF No. 18-1.)   The State filed a "Notice of Intent to Seek Enhanced Punishment," pursuant to Tennessee Code Annotated ("T.C.A.") § 40-35-202.   (Not. of Enhancement, *id.*, Page ID 181, ECF No. 18-1.)   On March 15, 2004, a jury trial commenced in the SCCC.   On March 20, 2004, the jury returned a guilty verdict on Counts 1-7. (Jury Verdict, *id.*, Page ID 187, ECF No. 18-1.) The State filed a Motion for Consecutive Sentencing, requesting that Counts 1 & 2 of especially aggravated kidnapping be served consecutively, because of factors 1, 8, and 9, pursuant to T.C.A. § 40-35-115: (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood; (8) Consecutive sentences reasonably relate to the severity of the offenses committed; and (9) Consecutive sentences are necessary in order to protect the public from further serious criminal conduct by the defendant.   (*See* Motion for Consecutive Sentencing, id., Page ID 188-89,

ECF No. 18-1.)  The trial judge sentenced Holmes to a total of 70 years imprisonment.

Judgement was entered on April 27, 2004.  (J., *id.*, Page ID 191-200, ECF No. 18-1.)

On May 27, 2004, Holmes, through his counsel, Charles Waldman, filed a Motion for New

Trial (Mot. for New Trial, *id.*, Page ID 201-04, ECF No. 18-1), which the court overruled on May

27, 2004 (Order Overruling Mot. for New Trial, *id.*, Page ID 205, ECF No. 18-1).  On May 27,

2004, the court appointed counsel, Charles Waldman, to represent Holmes in his appellate

proceedings.  (Order Appointing Private Appellate Counsel for Indigent Def., *id.*, Page ID 206,

ECF No. 18-1.)  Holmes filed a Notice of Appeal to the Tennessee Court of Criminal Appeals

("TCCA") on May 28, 2004.  (Not. of Appeal, id., Page ID 207, ECF No. 18-1.)

In his direct appeal, Holmes challenged, *inter alia*, the following issues:

1.    Whether the evidence presented by the state to convict defendant Larry
      Holmes of especially aggravated kidnapping is sufficient as a matter of
      law?

2.    Whether the evidence presented by the state to convict defendant Larry
      Holmes of aggravated robbery is sufficient as a matter of law?

3.    Whether the trial court erred by merging defendant's sentences when the
      facts constituting the elements of especially aggravated kidnapping and
      aggravated robbery overlap?

(Br. of Appellant, *id.,* Page ID 1684, ECF No. 18-13.) The TCCA affirmed.  (*State v. Holmes*, No.

W2004-01576-CCA-R3-CD, 2005 WL 1656830 (Tenn. Crim. App. July 15, 2005), *appeal denied*

(Tenn. Dec. 19, 2005)).

In upholding the conviction, the TCCA summarized the evidence introduced at trial:

This case relates to the invasion of the home of Trina Boyce at
approximately 4:00 a.m. on October 16, 2002, by an undetermined number of
intruders.  Ms. Boyce testified that she lived with her brother, husband, and five
children. She said that the house was a split-level style home with the main entrance
on the first level and from the entryway, a set of stairs led to a lower level from

which one can access the back yard, the swimming pool, and the lake. She said the first level had a deck overlooking the swimming pool. She said that on the night of October 15, 2002, her husband was out of town on business and that she was at home with her brother and five sons who at that time were ages three, five, and the remainder were teenagers. She said that her husband called from Dallas, Texas, at approximately 1:30 a.m. the morning of October 16 and that she talked to him for about one hour. She said that at about 3:30 a.m., their dog began barking and would not stop. She said that a few minutes later, her son Demarcus came upstairs wanting to borrow one of her miniskirts for a cheerleading skit at school. She said she sent him back downstairs and shortly thereafter, began hearing a pounding sound like an unbalanced washing machine. She said that she got up and went to the foyer because the dog was still barking and that she then heard voices at the front door saying, "Hurry up, hurry up." She said she yelled to Demarcus that someone was trying to break into the house, closed the foyer door, and headed for her bedroom where her two youngest children were sleeping.

Ms. Boyce testified that by the time she reached her bedroom door, she could see the first man entering the house wearing a ski mask and dark clothing. She said that they were claiming to be the police but that she knew the police did not wear masks. She said that the second man was wearing a sweat suit and a hooded shirt and that she could not see his face. She said that she locked the bedroom door but that the men pounded on it and eventually kicked it in. She said that they entered the bedroom and said, "B* * * *, where's your husband? We going to kill your m* * * * * f* * * * * * husband." She said she told the men her husband was not home, at which point they made her lie down and handcuffed her wrists behind her. She said the men asked where she kept the drugs, jewelry, and safe. She said she told them she did not have any money, a safe, or any drugs in the house. She said she could hear the men ransacking the house and asking each other, "Where is the s* * *?" She said that she heard one of them direct the others to check downstairs and upstairs and that they asked her how many people were in the house. She said she told them but the number of persons found did not coincide with her information because Demarcus had escaped. She said the men began looking for Demarcus.

Ms. Boyce testified that when the men left her alone to look for Demarcus, she crept downstairs and found her other two teenage sons and her brother handcuffed and lying on the ground. She said she hid downstairs and then heard some of the men yelling that she had escaped. She said that while they began to look for her outside, she went upstairs to get her two younger children. She said that she was still in handcuffs but that she was able to put one son on her back and the other followed her. She said that when she returned downstairs with both children, she heard the men running and yelling, "It's the police. It's the police." She said the men made lots of noise and then jumped off the back deck. She said police officers arrived shortly thereafter. She said they removed the handcuffs

from her and her family, searched the house, and apprehended two of the intruders. She said that she heard four different voices during the incident but that she saw only two men, the first person who entered the house and the man directly behind him. She said that the police recovered her wallet, checkbook, and identification and that they retrieved a purple Crown Royal bag containing quarters which she had kept in a nightstand drawer in her bedroom.

Ms. Boyce testified that the first man to enter the house carried a dark-colored semi-automatic weapon. She said that one man threatened to kill her husband and that another told her he would kill her if she did not tell them the location of the drugs and money. She acknowledged that she was placed in fear and held against her will. She said that apart from believing that she recognized the voice of one intruder, she was unable to identify any of the men who broke into her house.

On cross-examination, Ms. Boyce acknowledged that she could not identify the defendant as one of the perpetrators and that she told the police there may have been as many as five or six intruders that morning. She said that the entire episode lasted twenty to twenty-five minutes and that she was upstairs for fifteen to twenty minutes. She said her brother and two thirteen-year-old children were handcuffed and lying on their stomachs on the floor downstairs. She said that an eight-foot fence separates her property from that of the neighbor on the north side, that the lake is about one hundred feet from the back door entrance to the house, and that the backyard may be entered through two gates, one on either side of the house. She acknowledged that her mouth was not gagged, her feet were not tied, and nothing was placed over her head during the break-in.

Demarcus Teheir Boyce testified that on the morning the intruders invaded his home, his dog woke him earlier than usual. He said his bedroom was downstairs and located the farthest distance from the stairway. He said that he thought the dog needed to go outside and opened the back door but that she would not go outside and went upstairs instead. He said he followed her. He said the time was 4:25 or 4:30 a.m. He said that the dog started barking near the front door when he started to eat breakfast and that he went to the dining room window to check outside but before he reached the window, he heard someone at the front door. He said the noise sounded like "metal and stuff being turned and banging." He said his mother thought the noise was coming from him and asked what he was doing. He said that as she walked to the front door, he saw a van in the driveway and the shadow of someone standing at the door who told the dog to shut up. He said that his mother told him to go and ran toward her bedroom and that he then ran to the kitchen and out the back door. He said that he stood at the window for a moment and watched someone kick in the front door and run toward his mother's bedroom with a gun. He said he saw a second man enter the house but did not see

either man's face.   He said he ran toward the lake, jumped a couple of fences, and ran across the street to the home of a neighbor, who called the police.

On cross-examination, Demarcus acknowledged that he did not know the defendant and had never seen him before.   He acknowledged that he did not wear eyeglasses or contact lenses.

Andre Weathers, Trina Boyce's brother, testified that he occasionally lived with the Boyce family and was staying at their house when the incident occurred.   He said he slept in the guest bedroom located downstairs.   He said that on October 16, 2002, at approximately 4:30 a.m., he heard voices upstairs and a rumble, like someone kicking in the door.   He said he could discern running and movement but did not recognize the voices.   He said he went to the bottom of the stairs and heard a few of the men say they were the police and looking for something.   He said that he heard another man say someone is downstairs and that he attempted to return to his room but one of the men came downstairs, stopped him, and instructed him to lie flat on the ground with his hands behind his back.   He said that because it was dark, he could not see what the man was wearing or any details concerning his appearance.   He said that the man had a nickle-plated handgun but that he could not tell the caliber of the weapon.   He said the man handcuffed his wrists, picked him up by the handcuffs, and asked him who else was downstairs.   He said he replied that his two nephews, A.J. and Arron, were sleeping in a bedroom down the hall and called their names.   He said that the boys did not respond immediately and that he called them again.   He said a second man arrived just as the boys emerged from their bedroom.   He said they were handcuffed and placed face down on the ground together.

On cross-examination, Mr. Weathers estimated that five or six men were involved in the incident.   He acknowledged that in his statement to police, he said one of the men had a .38 caliber nickel-plated revolver and the other had what resembled a 9 millimeter or a .45 caliber black semi-automatic weapon.   He acknowledged that his face and mouth were not covered and that his feet were not bound.   He said that even when the men left the area downstairs, he was frightened and unable to get up or move around until the police arrived.

Arron Boyce testified that on October 16, 2002, he was awakened by his brother, A.J., who told him their uncle was calling them.   He said he and his brother shared a bedroom on the downstairs level, where the bedrooms of his uncle Andre and Demarcus were also located.   He said he went into the hallway and saw his uncle standing with his hands behind his back and a gun pointed at his head. He said that his uncle told him to do whatever the gunman said and that the man instructed the boys to get on their knees and put their heads down.   He said that the man was short and wore dark clothes and a mask and that a second man who was taller and light-skinned joined them.   He said the men put handcuffs on him and

his brother, claimed they were the police, and asked them where the money was. He said that after the men placed him and his brother face down on the ground alongside his uncle, he noticed the handcuffs were made of plastic. He said that when the two men went upstairs, he removed his handcuffs and also helped A.J. remove his. He said he had contact with only two of the intruders and did not recognize either one, except that one of them had a familiar voice.

On cross-examination, Arron acknowledged that he did not know the defendant and had never seen him at their house. He acknowledged that his mother was moving about the house even though handcuffed and that he could have moved about the house if he had wanted. He conceded that he was only "kept down" while the men were present but said that they had instructed the victims to stay where they were.

Anthony Boyce, nicknamed "A.J.", testified that on October 16, 2002, he was awakened at approximately 4:20 a.m. by his uncle repeatedly calling his and his brother's names. He said that he woke Arron and that they went into the hallway. He said that as soon as they left their room, two men told them to get on the floor. He said they complied and, two minutes later, were instructed to go back down the hallway where handcuffs were placed on their wrists. He said they were then told to get down again. He said he recognized the voice of one of the men as a friend of his father, and he identified one of the codefendants in court. He said that the man asked them the location of the money and that both men had guns. He said one man had a gun pointed at his uncle's head. He said that the men left to look for Demarcus and that he heard them run out the door when someone said "police." He said the police arrived and removed the handcuffs.

On cross-examination, A.J. acknowledged that he had never seen the defendant before that day. He acknowledged that he did not realize the handcuffs were plastic until his brother told him. He acknowledged that his mother was moving about the house, even though handcuffed, and that he also could have moved. He denied that any of them moved after learning the handcuffs were fake and said that they all stayed on the ground until the police arrived. He conceded that his feet were not bound and that his mouth was not gagged.

Memphis Police Officer David Beckham testified that on October 16, 2002, he arrived at the house at approximately 4:30 a.m. He said that other police officers were already present and that he heard yelling in the backyard. He said he ran to the back and observed Officers Jordan and Baker taking a suspect into custody. He testified he overheard the suspect say he was in the market to buy some real estate property and was looking at the backyard because he was interested in purchasing the house. He identified the codefendant, Jones, as the suspect in custody. He said he then entered the house and found two adults, two young children, and two teenagers on the floor. He said at least three were in

handcuffs.  He said he secured the house and began removing the handcuffs.  He said one of the teenagers had removed the handcuffs himself.  He said the female adult was crying, the male adult was angry, and the teenagers were nervous and frightened.

On cross-examination, Officer Beckham testified that he recalled seeing the defendant either in the victims' backyard or in the back of the police car on the day of the incident.  He said the victims were able to give only general descriptions of the perpetrators: five to six African-American males wearing dark clothing.  He acknowledged that they gave no details regarding facial characteristics.  He said the officers recovered three handguns, several ski masks, and the victim's property, which was scattered throughout the backyard.

Memphis Police Officer Michael Bach testified that he responded to the call regarding the home invasion robbery in progress at the victims' house.  He said that other officers were present when he arrived at approximately 4:30 a.m. and that he and Officer Beckham assisted in securing the house.  He said Officer Beckham helped the victims out of their handcuffs while he went to the backyard and helped search for suspects.  He said the officers found the defendant hiding in some shrubs under a dock or pier in the backyard of the neighbor's house.  He said that Officer Baker removed the defendant from the bushes and handcuffed him.  He said that the defendant complained he had two broken legs and that he was transported to the hospital.  He said that he and his partner, Officer Cave, went to the hospital and recovered from the defendant a purple Crown Royal bag containing some quarters.  He identified the bag recovered from the defendant at the hospital and acknowledged that his name and that of Officer Cave was written on the evidence envelope.

On cross-examination, Officer Bach was asked if he recovered the purple Crown Royal bag, and he replied he did not.  He also admitted that he was not present when the bag was discovered. He said Officer Cave recovered the bag from the defendant and then told him about it.  He conceded that he did not know the defendant was in fact "hiding" in the bushes and that he did not know what the defendant was doing in the bushes or how he came to be there.

Memphis Police Officer William Harsley testified that he worked in the crime response unit and responded to a call to take photographs and collect and tag evidence at the crime scene.  He said he collected a .45 caliber pistol and a .38 caliber pistol.  He acknowledged he did not lift fingerprints from any of the evidence collected, including the pistols.  He explained that due to the texture of the weapons, they would have to be chemically processed because the fingerprints could not be removed with powder.

Memphis Police Officer Jeffrey Jordan testified that he and Officer Baker were the first officers to arrive at the crime scene and that they saw a white Chevy van in the driveway with the motor running. He said they turned off the motor and then heard some commotion coming from the rear of the house. He said it sounded like a bunch of people running around, throwing things. He said he went to the left of the house, kicked the fence in, and walked around the corner of the house. He said he saw a black pistol by the swimming pool and heard the commotion moving away from him. He said he followed the sounds to another fence which separated the victim's backyard from the neighbor's property. He said that the end of the fence jutted over the lake and that he saw wet footprints and a dock on the other side. He said that he also saw one of the suspects lying in the grass on the neighbor's property about twenty-five feet from the fence and asked him how he got there. He said the suspect replied he was in the adjacent yard inspecting the estate because he was interested in purchasing the property when a group of men came running from the house. He said the victim's checkbook, driver's license, and wallet were lying at the suspect's feet. He said that the suspect's ankle was injured and that the officers had to help him get to the police car.

Memphis Police Officer James Baker testified that he and Officer Jordan arrived at the crime scene at the same time. He said he positioned his patrol car in the driveway to block a white van which had a broken window and popped steering column. He said the van was parked but the motor was running. He said that he headed for the backyard by the right side of the house and heard Officer Jordan yell that someone was running to the right. He said Officer Jordan ordered the suspect to halt and he did. He said they then found footprints leading through the yard to the adjacent property and began searching the perimeter of the yard. He said he saw two boots sticking out from underneath some bushes near the dock, with the remainder of the body lying underneath the pier. He said that he asked the defendant to come out but that the defendant replied he could not because his legs were broken. He said that the officers pulled him out from under the dock and asked what happened and that the defendant replied, "Oh, it was just a drug deal gone bad." He said the defendant claimed he arrived in the white van parked in front of the house. He said that the officers handcuffed the defendant and sent for an ambulance to transport him to the hospital.

On cross-examination, Officer Baker acknowledged that he patted down the defendant when he was removed from under the dock in a search for weapons and said that he removed a flashlight. He said he did not search inside the defendant's pockets.

(*State v. Holmes*, 2005 WL 1656830 at *1-6.)

On May 29, 2006, Holmes filed a *pro se* Petition for Post-Conviction Relief. (Pet. for

Post-Conviction Relief, *Holmes v. State*, No. 03-02148 (Shelby Cnty Crim. Ct.), Page ID 1842-46, ECF No. 18-17.) The court appointed counsel, Michel G. Floyd, to represent Holmes in his post-conviction relief proceedings on September 6, 2006. (Order Appointing Private Counsel to Represent Indigent Pet'r, *id.*, Page ID 1854, ECF No. 18-17.) On September 27, 2006, Michael G. Floyd withdrew as Holmes' counsel, and David Christensen was substituted as Holmes' counsel. (Order Allowing Att'y of R. to Withdraw and Allowing Other Counsel to Substitute, *id.*, Page ID 1855, ECF No. 18-17; Order Appointing Private Counsel to Represent Indigent Pet'r, *id.*, Page ID 1856, ECF No. 18-17.) On July 8, 2008, David Christensen withdrew as Holmes' counsel, and Betsy Weintraub was substituted as Holmes' counsel. (Second Order Allowing Att'y of R. to Withdraw and Allowing Other Counsel to Substitute, *id.*, Page ID 1857, ECF No. 18-17; Order Appointing Private Counsel to Represent Indigent Pet'r, *id.*, Page ID 1858, ECF No. 18-17.) On August 8, 2008, Betsy Weintraub withdrew as Holmes' counsel, and David Christensen was substituted as Holmes' Counsel. (Third Order Allowing Att'y of R. to Withdraw and Allowing Other Counsel to Substitute, *id.*, Page ID 1859, ECF No. 18-17; Order Appointing Private Appellate Counsel for Indigent Def., *id.*, Page ID 1860, ECF No. 18-17.)

On October 17, 2008, Holmes, through his counsel, David Christensen, filed his first Amended Petition for Post-Conviction Relief. (First Am. Pet. for Post-Conviction Relief, *id.*, Page ID 1861-63, ECF No. 18-17.) On April 23, 2010, he filed his second Amended Petition for Post-Conviction Relief. (Second Am. Pet. for Post-Conviction Relief, *id.*, Page ID 1865-70, ECF No. 18-17.) On June 18, 2010, Holmes filed a supplement to his amended petition. (Br. in Support of Post-Conviction Relief, *id.*, Page ID 1872-74, ECF No. 18-17.)

On September 23, 2010, the court entered an order denying Holmes' amended Petition.

(Order Denying Pet. for Post-Conviction Relief, *id.*, Page ID 1877-85, ECF No. 18-17.) On October 15, 2010, Holmes, through his counsel David Christensen, filed a Notice of Appeal to the TCCA. (Not. of Appeal, *id.*, Page ID 1886, ECF No. 18-17.) On May 23, 2011, Holmes filed his Brief on Appeal as of Right from Judgment of the SCCC, arguing that: (1) the trial court erred by failing to dismissing the four especially aggravated kidnapping convictions, in violation of Art I, Sec. 8 of the Tennessee Constitution and *State v. Anthony*, 817 S.W.2d 299, 306 (1991); and (2) the trial court erred by failing to find Holmes' appellate counsel, Charles Waldman, to have rendered ineffective assistance of counsel. (Br. on Appeal of Right from J. of SCCC, *id.*, Page ID 2835, 2839-2844, ECF No. 18-25.)

The TCCA affirmed the SCCC's denial of post-conviction relief, and the Tennessee Supreme denied the permission to appeal. (*Holmes v. State*, No. W2010-02672-CCA-R3-PC, 2012 WL 1388485 (Tenn. Crim. App. Apr. 20, 2012), *appeal denied* (Tenn. Aug. 16, 2012).)

### B. Procedural History of Holmes § 2254 Petition

On October 23, 2012, Holmes filed his *pro se* § 2254 Petition, accompanied by a motion seeking leave to proceed *in forma pauperis*. (§ 2254 Pet. and Mot. for Leave to Proceed *in forma pauperis*, *Holmes v. Westbrooks*, No. 12-cv-2931-STA-tmp, ECF Nos. 1 & 2.) On October 29, 2012, the Court denied his Motion for Leave to Proceed *in forma pauperis* and ordered Holmes to pay the habeas filing fee, because his inmate trust fund account statement indicated an excess of twenty-five dollars ($25.00) at the time of filing his motion to proceed *in forma pauperis*. (Order Denying Leave to Proceed *in forma pauperis*, *id.*, Page ID 53, ECF No. 3.) On December 4, 2012, the Court entered an Order of Dismissal without prejudice for Holmes' failure to comply with the Court's October 29, 2012 Order. (Order of Dismissal, *id.*, ECF No. 4.) Judgment was

entered on December 4, 2012.   (J. in a Civil Case, *id.*, ECF No. 5.)

On December 11, 2012, Holmes filed the five dollar ($5.00) filing fee (Habeas Filing Fee, *id.*, ECF No. 6), and filed a Motion to Reopen the Case (Mot. to Reopen Case, *id.*, ECF No. 7). On December 26, 2012, Holmes field a second Motion to Reopen the case and reconsider the dismissal of his § 2254 Petition.   (Second Mot. to Reopen Case, *id.*, ECF No. 8.)   On January 3, 2013, the Court entered an Order granting Holmes' motions to reopen the case and vacated the Order of Dismissal and Judgment.   (Order Granting Mot. to Reopen Case, *id.*, ECF No. 9.)

The Court entered an Order for Respondent to file a response and file the state court record. (Order for Resp. and State Court R., *id.*, ECF No. 10.)   Respondent filed a Motion for Extension of Time (Resp't's Mot. for Ext. of Time, *id.*, ECF No. 15), which the Court granted (Order Granting Resp't's Mot. for Ext. of Time, *id.*, ECF No. 16.)   Respondent filed his Answer on March 4, 2013 (Ans., *id.*, ECF No. 17) and the State Court Record on March 6, 2013 (Not. of State Court R., *id.*, ECF No. 18.)   On April 5, 2013, Holmes filed a Motion for Extension of Time to File a reply (Pet'r's Mot. for Ext. of Time, *id.*, ECF No. 19), which the Court granted on April 26, 2013 (Order Granting Pet'r's Mot. for Ext. of Time, *id.*, ECF No. 21).   Holmes filed his Reply on May 28, 2013.   (Reply, *id.*, ECF No. 22.)

## II.   PETITIONER'S FEDERAL HABEAS CLAIMS

In his § 2254 Petition, Patterson raises the following issues:

1.   Ineffective Assistance of Trial and Appellate Counsel:

   (a) Appellate counsel's failure to include sentencing hearing transcripts in the appellate record (*See* § 2254 Pet., *id.*, Page ID 5, ECF No. 1.)

   (b) Appellate counsel's failure to adequately articulate the sentencing issue on appeal.   (*See id.*)

(c) Trial and appellate counsel's failure to argue a cognizable *State v. Anthony* claim at trial and on appeal.   (*See id*.)

(d) Trial counsel's failure to object to trial court's error in instructing the jury.   (*See id*.)

2. Trial court erred in failing to dismiss the kidnapping convictions, in violation of his Due Process rights.   (*See id* at Page ID 6.)

## III.   APPLICABLE LEGAL PRINCIPLES

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).   As explained below, there are a number of legal doctrines which apply to the analysis of this habeas petition.

### A.  Exhaustion and Procedural Default

Twenty-eight U.S.C. § 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal court to the state courts.   *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).   The petitioner must "fairly present"[2] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 837, 847-48 (1999).   Tennessee

---

[2] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam).   Nor is it enough to make a general appeal to a broad constitutional guarantee.   *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see also Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) (noting that the *Adams* holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes the court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 732; *see Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 322 (1995); *Coleman*, 501 U.S. at 750. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup*, 513 U.S. at 321; *see House v. Bell*, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

### B. Standard for Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).[3]

---

[3] The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007) (citing *William v. Taylor*, 529 U.S. at 410).

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).[4] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412-13. Under this ground for relief, the state court's application of clearly established federal law must be "objectively unreasonable." *Id.* at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Williams*, 529 U.S. at 411.

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In *Rice v. Collins*, 546 U.S. 333, 341-42 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."[5]

---

[4] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (same); *Treesh v. Bagley*, 612 F.3d 424, 429 (6th Cir. 2010) (same).

[5] In *Wood*, 668 U.S. at 293, 299, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.'" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010); *see Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

## C. Ineffective Assistance of Counsel Standard

A claim that ineffective assistance of counsel has deprived a movant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id.* at 686.

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance. [*Strickland*, 466 U.S.] at 689. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' *Id.* at

evidence. The Court ultimately found it unnecessary to reach that issue. *Id.* at 300-01, 304-05. In *Rice*, 546 U.S. at 339, the Court recognized that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable.

687." *Harrington*, 562 U.S. at 104.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[6] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [*Strickland*] at 693. Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' *Id.* at 687." *Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 687, 693); *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to rule out [a more favorable outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.")

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). When an ineffective assistance claim is reviewed under § 2254(d), the review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Federal courts must show caution when evaluating ineffective assistance claims under § 2254(d), because "when § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

---

[6] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Id.* at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

## IV.  ANALYSIS OF PETITIONER'S CLAIMS

### A.  Ineffective Assistance of Trial and Appellate Counsel (Claims 1(a)-(d))

Holmes argues various claims of ineffective assistance of counsel regarding his trial and appellate counsel.[7]  Some of these claims were presented to the TCCA either on direct appeal and/or appeal of his post-conviction relief, and some of these claims were never presented to the TCCA.  Thus, the questions before the Court on the claims of ineffective assistance of trial and appellate counsel are: (1) whether Holmes' claims were properly exhausted before the TCCA, and (2) whether the TCCA's decision properly analyzed Holmes' claims under *Strickland*.

### a.  Ineffective Assistance of Trial and Appellate Counsel: Claims 1(a)-(c)

In Claims 1(a)-(c), Holmes argues that: (a) his appellate counsel rendered ineffective assistance of counsel for failing to include the sentencing hearing transcripts in the appellate record; (b) his appellate counsel rendered ineffective assistance of counsel for failing to adequately argue the sentencing issues on appeal; and (c) his trial and appellate counsel rendered ineffective assistance of counsel for failing to introduce a cognizable *State v. Anthony* claim at trial and on appeal.   (*See* § 2254 Pet., *Holmes v. Westbrooks*, Page ID 5, ECF No. 1.)

In his Answer, Respondent contends that relief should be denied for these claims, because "[t]he TCCA's ruling is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court" and the TCCA's ruling is "based on a reasonable determination of the facts in light of the evidence presented in the state court proceedings."   (Ans., *id*., Page ID 138, ECF No. 17.)

In his Reply, Holmes further supports his claims for ineffective assistance of counsel.   In

---

[7]  Holmes was represented by the same counsel, Charles Waldman, at trial and on appeal.   (*See* § 2254 Pet., *Holmes v. Westbrooks*, Page ID 12, ECF No. 1.)

support of Claim 1(a), Holmes argues that his counsel failed to render effective assistance of counsel by neglecting to include the sentencing hearing transcript in his direct appeal, which prejudiced him by depriving him of a "full and fair review of his direct appeal."  (Reply, *id*., Page ID 2965, ECF No. 22.) He further argues that counsel's deficient performance "definitely does not fall in the wide spectrum of what can be considered reasonable assistance of counsel and clearly [he] was prejudiced as a result of counsel's conduct."  (*Id*.)  In support of Claim 1(b), Holmes contends that counsel's deficient performance in Claim 1(a) caused counsel to inadequately argue any sentencing issues on direct appeal.  Specifically, Holmes contends that, "[b]ut for Counsel's failure to include the transcript, Petitioner would have challenged the judge's imposition of sentence at the top of the range to be served consecutively."  (*Id*. at Page ID 2967.)

Lastly, in support of Claim 1(c), Holmes contends that his counsel rendered ineffective assistance because he failed to "recognize and pursue a Due Process violation on Petitioner's behalf at trial and on appeal by failing to correctly apply *State v. Anthony . . .*"  (*Id*.)  Holmes maintains that he was prejudiced by counsel's deficient performance because " counsel improperly argued a double jeopardy claim instead of a due process violation" for the aggravated robbery and especially aggravated kidnapping offenses.  (*Id*. at Page ID 29666.)

The TCCA made the following conclusions regarding Claims 1(a)-(c):

> The Petitioner argues that trial counsel provided ineffective assistance on direct appeal by failing to include the transcript of the sentencing hearing in the record and by failing to present a coherent sentencing argument.  The State responds that the trial court properly denied relief because the Petitioner did not establish that he was prejudiced by counsel's performance.

> Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984); *see*

*Lockhart v. Fretwell*, 506 U.S. 364, 368–72, 113 S. Ct. 838, 122 L.Ed.2d 180 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n. 2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the *Strickland* test. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." *Id.*

In *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were "within the range of competence demanded of attorneys in criminal cases." Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974), and *United States v. DeCoster*, 487 F.2d 1197, 1202–04 (D.C. Cir. 1973). *Baxter*, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *See DeCoster*, 487 F.2d at 1201; *Hellard*, 629 S.W.2d at 9.

As we have noted, trial counsel raised a sentencing issue but failed to supplement the direct appeal record with the transcript of the sentencing hearing. *See Larry Holmes*, slip op. at 13–14. Due to insufficiencies in trial counsel's argument relative to sentencing, this court treated the sentencing review as waived. Counsel's failures in this respect were deficient performance.

The remaining question is whether the Petitioner was prejudiced by counsel's shortcomings. The Petitioner contends that there was not sufficient proof

to support independent convictions for both aggravated robbery and especially aggravated kidnapping and that the absence of the sentencing transcript and adequate argument prevented the appellate court from dismissing the especially aggravated kidnapping convictions on due process grounds.   Regarding the question of prejudice, we note that the trial court merged the aggravated robbery convictions with the higher-grade especially aggravated kidnapping convictions and sentenced the Petitioner for the greater offenses.   This court held in the Petitioner's direct appeal that sufficient proof supported the merged convictions.   We note, as well, that in the jointly tried co-defendant's appeal, this court said the following with respect to the co-defendant's *Anthony* claim that arose under the same facts and in the same trial proceeding as the Petitioner's:

> In our view, the confinement of the victims was beyond that necessary for the commission of the aggravated robberies.   The defendant [Jones] and his accomplices [one of whom was the Petitioner] were armed with handguns and used them to subdue the victims.   They chose to further restrain the victims by handcuffing them behind their backs, requiring them to lie face-down.   Ms. Boyce was the only robbery victim.   The perpetrators, however, chose to confine all of the occupants of the residence.   The two teenaged boys downstairs had slept through the break-in and, behind the closed door of their bedroom, were not an apparent threat to the defendant and his cohorts.   Nonetheless, the boys were awakened, cuffed, and moved to the hallway with Ms. Boyce's brother. After learning that one of Ms. Boyce's children, the one who had fled to a neighbor's residence, was unaccounted for, the perpetrators were determined to find and confine him as well.   This demonstrates a separate intent from robbery.   That the police arrived and interrupted the crimes, preventing further physical harm to the victims, does not change the analysis.   The handcuffing of the victims would have hindered their efforts to seek aid, increased their risk of harm, and lessened the defendant's risk of detection.

> In support of his argument, the defendant specifically directs this court to *State v. Coleman*, 865 S.W.2d 455 (Tenn. 1993).   In *Coleman,* the defendant forced the victim, a shoe store clerk, to empty the cash register at gunpoint.   After his accomplice left with the money, the defendant directed the victim into a back room, where he ordered her to undress, raped her, and, before leaving, instructed her not to get up.   865 S.W.2d at 456–57.   The defendant was convicted of armed robbery, aggravated rape, and aggravated kidnapping.   Our high court, however, reversed the kidnapping conviction pursuant to *Anthony*.

> In our view, the facts of *Coleman* are distinguishable from the facts in this case.   In *Coleman*, the victim was not physically restrained and was directed

to the back room of the store to facilitate the rape. After the assault, the defendant did not lock or otherwise block the door. In this case, however, each of the victims was handcuffed behind his or her back and forced to lie face-down, a position which rendered them defenseless and largely immobilized. Accordingly, the defendant is not entitled to relief on this issue.

*State v. Lacey Jones*, No. W2004–01628–CCA–R3–CD, Shelby County, slip op. at 3 (Tenn. Crim. App. Aug. 4, 2005), *perm. app. denied* (Tenn. Dec. 19, 2005).

When faced with the question of merger of the aggravated robbery convictions with the especially aggravated kidnapping convictions in the co-defendant's direct appeal, this court said:

Initially, the two aggravated robbery convictions are for the taking of jewelry from Trina Boyce. The state merely charged the defendant [Jones] with different theories of culpability. Accordingly, it would have been both necessary and appropriate for the trial court to have merged one conviction into the other. That having been said, the trial court did not, in our view, exceed its authority when it merged the defendant's aggravated robbery convictions into the convictions for especially aggravated kidnapping. As already determined, the dual convictions for aggravated robbery and especially aggravated kidnapping did not violate the principles of due process. Nevertheless, the trial court merged the convictions and declined to sentence the defendant separately for the aggravated robbery. With regard to merger, this court has previously stated that "'the trial court has the power to enter the appropriate judgment. This authority does not impinge upon or amend the verdict so long as the judgment does not subject the defendant to a conviction and sentence which exceeds the jury's determination of culpability.'" *State v. Price*, 46 S.W.3d 785, 825 (Tenn. Crim. App. 2000) (quoting *State v. Hill*, 856 S.W.2d 155, 157 (Tenn. Crim. App. 1993)). Had the trial court not merged the offenses, the defendant would have been exposed to an additional consecutive sentence. Thus, any error inured to the benefit of the defendant and does not give rise to relief.

*Lacey Jones*, slip op. at 4. Given this court's ruling in the jointly tried co-defendant's direct appeal, we conclude that the Petitioner would not have obtained relief had trial counsel presented a complete record on appeal and adequately argued that the especially aggravated kidnapping convictions and the resulting sentences violated due process. The Petitioner, thus, has not shown that he was prejudiced by trial counsel's deficient performance. The Petitioner is not entitled to relief.

*State v. Holmes*, 2012 WL 1388485 at *9-12.

Holmes has properly exhausted Claims 1(a)-(c) before the TCCA. Therefore, this Court must look to whether the TCCA properly analyzed Holmes' claims under *Strickland*. Unlike his arguments before the TCCA, Holmes does argue before this Court that his counsel's performance was not only deficient and fell below the objective standard of efficient counsel, but also, that his counsel's performance prejudiced him as well. Holmes provides arguments how his counsel's alleged cumulative errors, specifically with regards to his failure to file the sentencing transcript proved to be significantly deficient and prejudicial to him and deprived him of his Sixth Amendment right to effective assistance of counsel. (*See* Reply, *Holmes v. Westbrooks*, Page ID 2967, ECF No. 22.)

However, even though Holmes more adequately supports his ineffective assistance of counsel claims before this Court than he did before the TCCA, he does not state whether TCCA's decision was contrary to, or an unreasonable application of, clearly established federal law, or whether the decision was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceedings. The decision of the TCCA was a run-of-the-mill decision applying the holding of *Strickland* to the facts of the case, and, therefore, it was not contrary to *Strickland*.

Holmes also has not satisfied his burden of demonstrating that the decision of the TCCA was an unreasonable application of *Strickland* or was based on an unreasonable factual determination. The TCCA directly cited and applied the two-prong test of *Strickland* to Holmes' ineffective assistance of counsel claims before finding that Holmes was not entitled to relief. As to the first prong of *Strickland*, the TCCA appropriately found that Holmes' counsel, Charles Waldman, performance was deficient and fell below an objective standard of reasonableness for

failing to include the sentencing hearing transcript on appeal. Holmes is correct that, without the sentencing hearing transcript, the TCCA was unable to examine or properly understand the sentencing issues he wished to argue on appeal. Therefore, the first prong of *Strickland* has been satisfied and was properly analyzed by the TCCA.

As to the second prong of *Strickland*, the TCCA found that counsel's performance was not prejudicial to Holmes because, even if a complete record had been provided on appeal, Holmes' convictions and sentencing were properly supported by the record and were not rendered in violation of his due process rights. In his § 2254, Holmes argues that his counsel's deficiency was the direct result of his lengthy sentence and his inability to raise any sentencing issues on appeal. Holmes also argues that if his counsel had argued his sentencing issues under a *State v. Anthony* theory, instead of a double jeopardy theory, his sentencing issues would have been successful on appeal.

At the post-conviction hearing, Holmes' counsel, Charles Waldman, was specifically asked about his arguments made at the sentencing hearing. The following exchange occurred during Waldman's direct examination:

> Q.        Well, I do have the sentencing hearing here today and I have a question on a certain page, it's page twenty-five and I'm going to read to you, if you have any questions or anything, I'll bring it up there. It says - - this is you speaking to the Court. I don't think the State made its case or at least beyond a reasonable doubt on the issue of especially aggravated kidnapping, and then, if the intent was to rob, then I'm not sure what that does to the aggravated burglary.
>
>         Certainly, the taking of the property from the residence, certainly overlaps with the taking of personal properly from somebody in the residence at the time. So, I think we've got these *Anthony* type problems to deal with. When all is said and done, obviously, I know he's a range three and I can't argue around that, at least not at this moment in time. And I would ask that the Court, it would be a serious sentence anyway, I would ask

the Court to recognize that and sentence him accordingly, and then, that was the end of your - - of your argument. Now, during that - - during that argument, you mentioned the term overlap, as in I assume, some of the proof from these separate counts overlaps, and then you said we've got these *Anthony* type problems. What were you referring to when you say *Anthony*?

A.         Well, the case was *State vs. Anthony* which was the case that set out - - the analysis for the differentiating between the overlapping elements of especially aggravated kidnapping and aggravated robbery.

Q.         Well, did you consider *State v. Anthony* to be a double jeopardy issue?

A.         Well, you know, you can argue or you could argue that. I don't think that was argued successfully. In fact, that's why that case stands, it stands to - - to answer the question of whether there is double jeopardy here. And I think Judge Craft analyzed it correctly when he applied it in this case, and you see, at that point when we were about to do the sentencing, there was definitely a question in our minds as to whether or not these elements that had been proved by the facts whether they were truly aggravated robbery or whether they were especially aggravated kidnapping, and that's what we meant by the overlap. When he analyzed *Anthony* and, you know, obviously, he and I agree, I think - - I think the elements of *Anthony* were met and that's the reason why he - - Judge Craft said, you know, I'm going to merge the - - the elements of the aggravated robbery effectively into this especially aggravated kidnapping. He was doing so, following *Anthony* to do it.

Q.         Did you consider *State v. Anthony* a double jeopardy issue?

A.         Initially, of course, initially we did. But when you really look at *Anthony* carefully and there's another case actually after *Anthony* that's also, I forget the name of it now, but it deals with the same issues, I think that Judge Craft sidestepped the issue of double jeopardy.

Q.         So, that would be a yes on the double jeopardy?

A.         Yes.

Q.         *Anthony* is a double jeopardy issue?

A.         It is a double jeopardy issue. It deals with double jeopardy - - it resolves the double jeopardy issue is what *Anthony* does.

26

Q.          Not a due process issue?

A.          Well, no, I didn't see it so much as a due process issue, I saw it as here's *Anthony*. *Anthony* speaks to the analysis that you have to follow and the question then becomes how long are these people in the state that they're in, in order to be either deemed to have been kidnapped or is this a - - a temporary restrainment - - restraint of their movement in order to effect a robbery. That's the question.

(Pet. for Post-Conviction Relief Hr'g Tr., *Holmes v. State*, Page ID 1971-75, ECF No. 18-19.)

Despite the exchange between Holmes' post-conviction counsel and Waldman regarding whether *Anthony* is a double jeopardy issue or a due process issue, the second prong of *Strickland* cannot be satisfied. As evidenced by the post-conviction hearing transcript, counsel's deficient performance did not prejudice Holmes because counsel did argue an *Anthony* claim, as he understood it, before the sentencing judge and referenced the sentencing judge's reliance on *Anthony* in his brief on appeal. Holmes has not shown how an argument under *Anthony* would have changed the length of his sentence or the factors used to determine his sentence. The facts of the case and the appropriate merging of the aggravated robbery and especially aggravate kidnapping convictions were properly determined by the court and properly analyzed by the TCCA.

Therefore, Claims 1(a)-(c) are without merit and are DISMISSED with prejudice.

b.    Ineffective Assistance of Counsel: Claim 1(d)

In Claim 1(d), Holmes argues that his counsel rendered ineffective assistance of counsel for failing to challenge to the trial court's improper jury instructions. (*See* § 2254 Pet., *Holmes v. Westbrooks*, Page ID 5, ECF No, 1.) Respondent argues that this claim was never presented before the TCCA, and, therefore, should be denied as procedurally defaulted. (*See* Ans., *id.*, Page ID 131-32, ECF No. 17.) In his Reply, Holmes concedes that this claim could be procedurally

defaulted, but contends that the default should be excused, pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). He further argues that "because his trial and appeal counsel [were] ineffective [his counsel] is the cause of the Petitioner's procedural default and the reason [this] issue [was not] properly presented." (Reply, *Holmes v. Westbrooks*, Page ID 2967, ECF No. 22.)

Claim 1(d) of Holmes' ineffective assistance of trial counsel claims was not presented to the TCCA. Holmes' claims are considered to be exhausted because of his procedural default, and he has no avenue remaining for presentation of the claims given the state statute of limitations on state post-conviction relief. This procedural default operates as a complete and independent procedural bar to federal habeas review of Claim 1(d).

In order to survive this procedural defect, Holmes would have to show cause that he should be excused from failing to present these claims on appeal by showing actual prejudice or by showing that a failure to review his claims would result in a fundamental miscarriage of justice. To demonstrate a fundamental miscarriage of justice, Holmes would have to show he is actually innocent of the crimes he was convicted of. Holmes does not argue that he is actually innocent. However, Holmes indirectly argues that he would be actually prejudiced if his failure to raise this claim of ineffective assistance of counsel was not excused because of the ineffectiveness of his post-conviction counsel.

Holmes claims of ineffective assistance of counsel cannot establish cause for his procedural default, however, because this claim is procedurally defaulted. The Supreme Court has explained that even though ineffective assistance of counsel can be cause for a procedural default, the exhaustion doctrine, which is "principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," generally requires

that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986) (internal citation omitted).

Holmes did not avail himself of his post-conviction remedies to exhaust this claim of ineffective assistance by his trial and appellate attorney. "[A]ttorney error cannot constitute cause where the error caused a petitioner to default in a proceeding in which he was not constitutionally entitled to counsel, *e.g.* a discretionary appeal or state post-conviction proceeding." *See Coleman v. Thompson,* 501 U.S. at 751-53 (internal citations omitted). Holmes has not established cause and prejudice for his procedural default and presents no tenable claim of factual innocence. Thus, he cannot avoid the procedural bar erected by the state post-conviction statute of limitations and cannot seek federal habeas relief on Claim 1d.

"There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman,* 501 U.S. at 752 (internal citations omitted). Attorney error cannot constitute "cause" for a procedural default "because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 753 (internal quotation marks omitted). Thus, where the State has no constitutional obligation to ensure that a prisoner is represented by competent counsel, the petitioner bears the risk of attorney error. *Id.* at 754.[8]

_____

[8] *See also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

In 2012, the Supreme Court issued its decision in *Martinez v. Ryan*, ___ U.S. at ____, 132 S. Ct. at 1320, which recognized a narrow exception to the rule stated in *Coleman* "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* The Supreme Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here . . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* at ___, 132 S. Ct. at 1320. The requirements that must be satisfied to excuse a procedural default under *Martinez* are as follows:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, ___U.S. at ___, 133 S. Ct. at 1918 (emphasis and revisions in the original).

*Martinez* arose under an Arizona law that does not permit ineffective assistance claims to be raised on direct appeal. *Id.* at ___, 132 S. Ct. at 1313. In the Supreme Court's subsequent decision in *Trevino*, ___ U.S. at ___, 133 S. Ct. at 1921, the Supreme Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to

raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." Thus, the decision in *Trevino* modified the fourth requirement stated by *Coleman* for overcoming a procedural default.

Ineffective assistance of state post-conviction counsel can establish cause to excuse a Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial counsel was constitutionally ineffective. *Sutton v. Carpenter*, 745 F. 3d at 787, 795-96 (6th Cir. 2014). To be "substantial" under *Martinez*, a claim must have "some merit" based on the controlling standard for ineffective assistance of counsel. *Martinez*, ___ U.S. at ___, 132 S. Ct. at 1318-1319.

*Martinez* elaborated on what it meant for a claim to be "substantial":

When faced with the question whether there is cause for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, i.e., it does not have any merit or that it is wholly without factual support, or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards.

132 S. Ct. at 1319. *Martinez* requires that a petitioner's claim be rooted in "'a potentially legitimate claim of ineffective assistance of trial counsel.'" *Cook v. Ryan*, 688 F.3d 598, 610 (9th Cir. 2012) (quoting *Lopez v. Ryan*, 678 F.3d 1131, 1138 (9th Cir. 2012)), *cert. denied*, 133 S. Ct. 55 (2012). The petitioner must show a "substantial" claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim. *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 752 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 998 (2014). *See Hoak v. Idaho*, No. 1:09–CV–00389–EJL, 2013 WL 5410108, at *7 (D. Idaho Sept. 25, 2013) ("*Martinez* requires the district court to review but not determine whether trial counsel's acts or omissions resulted in deficient performance and in a reasonable probability of prejudice, and to determine only whether resolution of the merits of the claim would be debatable among jurists of reason and whether the issues are deserving enough to encourage further pursuit of them."); *see*

*also Gunter v. Steward*, No. 2:13–CV–00010, 2014 WL 2645452, at *13 (M.D. Tenn. June 13, 2014) ("[I]n many habeas cases seeking to overcome procedural default under *Martinez,* it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was 'substantial' enough to satisfy the 'actual prejudice' prong of *Coleman*."). The Supreme Court and the Sixth Circuit have not provided guidance as to how district courts reviewing habeas petitions are to implement the rulings in *Martinez and Trevino*. *See id*. at *12.

To the extent the petition may be construed as containing a claim that post-conviction counsel provided ineffective assistance of counsel by failing to raise this issue during the post-conviction proceedings, *Martinez* and *Trevino* cannot excuse Holmes' default of his ineffective assistance of counsel claims. Because it is unclear whether Holmes argues that his trial counsel and/or his appellate counsel rendered ineffective assistance of counsel by permitting the trial court to error in instructing the jury, this Court will examine Holmes' claims in light of an ineffective assistance of trial counsel claim and an ineffective assistance of appellate counsel claim. *Martinez* is limited to ineffective assistance of trial counsel claims. Therefore, Holmes is not entitled to *Martinez* relief, with regard to his ineffective assistant of appellate counsel claim, and has not presented any evidence to justify review of these claims to prevent an actual prejudice or a fundamental miscarriage of justice.

As to his claims of ineffective assistance of trial counsel, Holmes is not entitled to relief because he cannot meet the four factor test of *Martinez*. Specifically, Holmes has not shown a substantial claim of ineffective assistance of trial counsel. Holmes argues that his trial counsel rendered ineffective assistance of counsel by failing to object to the trial court's allegedly erroneous

jury instructions.

Holmes has never presented this ineffective assistance of trial counsel claim before the court in any initial state collateral review proceedings. Holmes presented the issue that the trial court erred in instructing the jury during his post-conviction proceedings, but under a theory of trial court error and not ineffective assistance of trial counsel, only during the initial stages of his post-conviction proceedings and not on appeal to the TCCA. The SCCC concluded that Holmes did not present any evidence as to how the jury instruction prejudiced him and dismissed the claim without merit. The SCCC concluded the following:

> Petitioner asserts that his rights were violated because the Trial Court instructed the jury on criminal responsibility when the charge of criminal responsibility was not in the indictment against him. Therefore, violating Petitioner's right to be made aware of the charges against him. Generally, there is no need for the indictment to specifically allege that the State is relying on a theory of criminal responsibility for a conduct of another. *State v. Hensley*, 656 S.W.2d 410 (Tenn. Crim. App. 1983). Petitioner presents no evidence that the instruction prejudiced him in any way. Therefore this claim is without merit and is dismissed.

(Order Denying Post-Conviction Pet., *Holmes v. State*, No. 03-02148, Page ID 1883, ECF No. 18-17.)

Although this claim was presented under a theory of trial court error and not ineffective assistance of trial counsel during his post-conviction, the underlying claim of improper jury instructions was resolved on its merits by the SCCC. Holmes has not provided any evidence that had his trial counsel made the claim of improper jury instructions during trial that the SCCC's findings would be any different. Holmes has also not provided any evidence that had his post-conviction counsel raised this on appeal to the TCCA that the result would be any different. Holmes has not presented any credible proof from which the Court may conclude trial counsel performed deficiently and, as a result, Holmes was prejudiced. Holmes is not entitled to *Martinez*

or *Trevino* relief for Claim 1(d).

Claim 1(d) is barred by Holmes' procedural default and DISMISSED with prejudice.

## B. Trial Court Erred in Failing to Dismiss Kidnapping Convictions: Claim 2

In Claim 2, Holmes contends that the trial court denied him due process by failing to dismiss the especially aggravated kidnapping convictions. (*See* § 2254 Pet., *Holmes v. Westbrook*, Page ID 6, ECF No. 1.) Respondent argues that Claim 2 should be dismissed as procedurally defaulted because, although it was presented to the TCCA, the TCCA waived the claim since it should have been presented on direct appeal. (*See* Ans., *id.*, Page ID 131, ECF No. 17.) In his Reply, Holmes maintains that the procedural default should be excused, pursuant to *Martinez*.

The TCCA reviewed the issue and stated:

> The Petitioner argues that the trial court should have dismissed his especially aggravated kidnapping convictions under *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991). He characterizes the kidnapping convictions as "incidental" and contends that due process does not permit convictions for both aggravated robbery and especially aggravated kidnapping. The State responds that the Petitioner waived the issue because it was not raised on direct appeal and that the Petitioner has not demonstrated constitutional error on the merits of the issue. We hold that the issue is waived as a free-standing constitutional claim.

> In the conviction proceedings, the trial court merged the Petitioner's aggravated robbery convictions with his especially aggravated kidnapping convictions and sentenced the Petitioner for the especially aggravated kidnapping convictions. On appeal, this court noted that the sentencing hearing transcript was not included in the appellate record. Regarding the sentencing argument, this court said, "We are at a loss to determine what [the Petitioner] is asking for in his brief," and held that consideration of the issue was waived because the court could not determine the Petitioner's contention. The court also noted that the Petitioner's brief did not contain citations to authorities or sound argument. Despite the lack of clarity in the Petitioner's sentencing argument on direct appeal, we note that trial counsel raised a sentencing issue relative to the especially aggravated kidnapping convictions on direct appeal, not a due process issue with the convictions themselves. We also note that in the present post-conviction action, the Petitioner has raised the due process issue as a freestanding claim but has not raised an issue of

34

ineffectiveness of trial counsel in failing to raise the due process issue in the conviction proceedings.

Our post-conviction statute provides for waiver of issues that could have been, but were not raised in a previous proceeding. T.C.A. § 40–30–106(g) (2006). The trial court merged the aggravated robbery and especially aggravated kidnapping convictions. The Petitioner's claim that the especially aggravated kidnapping convictions should have been dismissed, rather than merged, could have been raised in the direct appeal. Because it was not, consideration of it at this juncture is waived. *See, e.g., House v. State*, 911 S.W.2d 705, 713–14 (Tenn. 1995).

*Holmes v. State*, 2012 WL 1388485, at *8-9.

The Sixth Circuit applies a four-part test to determine whether a habeas claim has been procedurally defaulted due to a petitioner's failure to comply with a state procedural rule:

First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . .

Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . .

Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . .

Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1985) (citations and footnote omitted); *see also Van Hook v. Bobby*, 661 F.3d 264, 269 (6th Cir. 2011) (same), *cert. denied sub. nom. Van Hook v. Robinson*, ___ U.S. ___, 132 S. Ct. 1917, 182 L.Ed.2d 781 (2012); *Clinkscale v. Carter*, 375 F.3d 430, 440-41 (6th Cir. 2004) (same).

Procedural default is an affirmative defense. *Trest v. Cain*, 522 U.S. 87, 89, 118 S. Ct. 478, 480, 139 L.Ed.2d 444 (1997) ("[P]rocedural default is normally a defense that the State is obligated

to raise and preserve if it is not to lose the right to assert the defense thereafter.") (internal quotation marks, alteration and citations omitted); *Gray v. Netherland*, 518 U.S. at 165, 116 S. Ct. at 2082 ("procedural default is an affirmative defense" for the State); *Whiting v. Burt*, 395 F.3d 602, 610 (6th Cir. 2005) (declining to enforce a procedural default that was not raised by the State); *Benoit v. Bock*, 237 F. Supp. 2d 804, 807 (E.D. Mich. 2003) (describing both exhaustion and procedural default as affirmative defenses).

Tennessee Code Ann. § 40-30-106(g) bars relief in a post-conviction proceeding for issues that could have been raised on direct appeal. *See*, *e.g.*, *Mobley v. State*, 397 S.W.3d 70, 104 (Tenn. 2013); *Brimmer v. State*, 29 S.W.3d 497, 530 (Tenn. Crim. App. 1998). The TCCA identified the applicable procedural rules and enforced those procedural sanctions. The first two *Maupin* factors have been satisfied.

The third requirement, that the state procedural rule must be an "adequate and independent" state ground, focuses on "the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims." *Maupin*, 785 F.2d at 138; *see also Henry v. Mississippi*, 379 U.S. 443, 447-48, 85 S. Ct. 564, 567, 13 L.Ed.2d 408 (1965) ("[A] litigant's procedural defaults in state proceedings do not prevent vindication of his federal rights unless the State's insistence on compliance with its procedural rule serves a legitimate state interest. In every case we must inquire whether the enforcement of a procedural forfeiture serves such a state interest. If it does not, the state procedural rule ought not be permitted to bar vindication of important federal rights."). The adequacy of a state procedural rule "is itself a federal question." *Lee v. Kemna*, 534 U.S. 362, 375, 122 S. Ct. 877, 885, 151 L.Ed.2d 820 (2002). "Ordinarily, violation of 'firmly established and regularly followed' state rules . . . will be adequate to foreclose review of a federal claim." *Id.* at 376, 122 S. Ct. at 885. The Supreme Court has held a procedural ground to be inadequate in "exceptional cases," such as where the application of a "generally sound rule" has

36

been deemed "exorbitant." *Id.* at 376, 122 S. Ct. at 885-86; *see also Walker v. Martin*, ___ U.S. ___,

___, 131 S. Ct. 1120, 1130, 179 L.Ed.2d 62 (2011) (a state procedural rule may be inadequate when

a state court "exercised its discretion in a surprising or unfair manner").

The Sixth Circuit Court of Appeals has held that § 40-30-106(g) is an independent and

adequate state ground. *Cone v. Bell*, 243 F.3d 961, 969 (6th Cir. 2001), *overruled on other*

*grounds by Bell v. Cone*, 535 U.S. 685 (2002); *see also Wallace v. Sexton*, No. 3:10-0521, 2013

WL 785914, at *4 (M.D. Tenn. Feb. 28, 2013); *Holt v. Carlton*, No. 2:06-CV-247, 2008 WL

687509, at *9 (E.D. Tenn. Mar. 12, 2008).[9]   The third *Maupin* factor has been satisfied.

Holmes rebuts the TCCA's determination that Claim 2 was waived and argues that he

should be excused for the procedural default, pursuant to *Martinez*.   However, similar to this

Court's analysis of *Martinez* and *Trevino* relief in Claim 1(d), *supra* pp. 27-33, the Court also finds

that Holmes has not shown a substantial claim of ineffective assistance of counsel.

Even though *Martinez* and *Trevino* are applicable to Tennessee cases, any allegation that

Petitioner's state post-conviction counsel was ineffective on appeal or ineffective for any other

---

[9]  The Supreme Court's decision in *Cone v. Bell*, 556 U.S. 449 (2009), is not to the contrary.   In
*Cone*, 556 U.S. at 464, the State presented two justifications for denying review of the prisoner's
*Brady* claim: that it was barred because it was presented on direct appeal and that it was waived
because it had never been properly presented in the state courts.   The Supreme Court held that
"the Tennessee appellate court did not hold that Cone's *Brady* claim was waived." *Id.* at 467-68.
Cone's post-conviction petition contained numerous claims, and the Tennessee Court of Criminal
Appeals had stated, without elaboration, that Cone had "failed to rebut the presumption of waiver
as to all claims raised in his second petition for post-conviction relief which had not been
previously determined." *Cone v. State*, 927 S.W.2d 579, 582 (1995).   According to the
Supreme Court, "[w]ithout questioning the trial court's finding that Cone's *Brady* claim had been
previously determined, the Court of Criminal Appeals affirmed the denial of Cone's
postconviction petition in its entirety.   Nothing in that decision suggests the appellate court
believed the *Brady* claim had been waived in the court below." *Cone*, 556 U.S. at 467 n.13.
The Supreme Court went on to explain that it was unclear precisely what the Court of Criminal
Appeals had held. *Id.* at 467 n.13.   Thus, the Supreme Court held that "the Tennessee Courts
did not hold that Cone waived his *Brady* claim," *id.* at 469, not that waiver is not an independent
and adequate procedural ground.

reason than failing to raise a meritorious trial counsel error, does not warrant any consideration in this proceeding. *See Martinez v. Ryan*, ___U.S. at ____, 132 S. Ct. at 1319. In Claim 2, Holmes does not argue that his post-conviction counsel failed to argue a meritorious trial counsel error, but, instead, that his post-conviction counsel failed to raise a claim of trial court error. Trial counsel's alleged failure to properly apply a *State v. Anthony* analysis to Holmes' kidnapping convictions and alleged failure to argue the dismissal of his kidnapping convictions have already been analyzed by this Court in Claim 1(a)-(c), *supra* pp. 19-27. Consequently, this Court need not consider whether *Martinez* or *Trevino* apply to Claim 2.

Therefore, Claims 2 is barred by procedural default and is DISMISSED with prejudice.

## V. CONCLUSION

Because all issues raised by Holmes are either barred by the doctrines of exhaustion and procedural default or are without merit, the petition is DISMISSED with prejudice. Judgment shall be entered for Respondent.

## VI. APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. at 335; *Bradley v. Birkett*, 156 F. App'x 771, 772 (6th Cir. 2005). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & 3. A "substantial showing" is made when the petitioner

38

demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Bradley*, 156 F. App'x at 773 (quoting *Slack*, 537 U.S. at 337).

In this case, there can be no question that the claims in this petition are barred by procedural default or are without merit. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a certificate of appealability.

For the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED.[10]

**IT IS SO ORDERED**, this 3rd day of February, 2016.

s/ **S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

---

[10] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).